May it please the Court, Robert Jackson on behalf of Appellant Petitioner Ricky Ray Malone, also present as co-counsel, Sarah Jernigan. This case is about the synergy of errors. Three errors combined to deprive Mr. Malone of his voluntary intoxication defense, which in turn those errors prevented his jury from properly considering and convicting Mr. Malone of a lesser included offense of second degree murder. The first error were objectively erroneous jury instructions as to the affirmative defense of voluntary intoxication. The second error involved defense counsel's failure to correct those erroneous instructions and the third error involved counsel's failure to properly prepare their expert witness who supported that voluntary intoxication defense. As for the instructions. Let me ask you, the errors, the error with the instruction, as I understand it, is that mens rea wasn't defined. It wasn't specifically directed at the mens rea element of first degree murder, is that correct? The jury was instructed that the, in effect that the mens rea for first degree murder was mens rea. That was the specific intent for first degree murder. Nowhere else in the instructions was mens rea defined. There was no way for Mr. Malone's lay jurors to link up mens rea with specific criminal intent or malice of forethought. Well, why was there no way? There was no way in the instructions. Didn't the arguments of counsel, didn't the way the jury trial was conducted make it very clear to the jury, as the OCCA said, that the issue here is whether he could have intended to kill whether he had malice of forethought given his state of intoxication? It was clear to the jurors, I would presume, that intoxication was an issue in the trial. However, it was also clear to the jurors that they were instructed as to the law by the instructions of the trial court. And that the arguments of counsel, those weren't evidence, and those certainly weren't the law. But the trial judge did instruct the jury in number 12, no person may be convicted of murder in the first degree unless the state has proved beyond a reasonable doubt each element of the crime. These elements are, first three, four, the death was caused with malice of forethought. The next instruction says, malice of forethought means a deliberate intention to take away the life of a human being. So, even if there was confusion, and I think probably everybody, including your adversary, has agreed that there's confusion in instruction number 38, because of mens rea, it should have been obviously of malice of forethought. The jury was specifically instructed that they could only convict of first degree murder if they found that the state has proven malice of forethought, and the jury was specifically instructed correctly in number 13 of what malice of forethought comprised, correct? The instructions as to malice of forethought, we don't take issue with those. The problem is that the voluntary intoxication instructions, they link back, they circle back around to the first degree murder instruction. And here they failed to do so because that mens rea, the bracketed mens rea language was left in the Ouija. It wasn't replaced with malice of forethought. So, it didn't point the jurors back to malice of forethought. Yes, so there was a problem with 38. So, let's say the jury didn't get additional clarity from the first sentence in instruction 38, but why would there be a need for additional clarity in instruction number 38 if 12 and 13 already unambiguously clearly informed the jury that they could only convict of first degree murder if they found that there was a, the state has proven a deliberate intention to take away the life of another human being? Well, there's more ambiguity, Your Honor. We can look at instruction 41 that talks about specific criminal intent. It uses that language called specific criminal intent, and it talked about intoxication having to overcome the specific criminal intent of willfully. And that may have had the effect of informing these jurors that. Well, that was defining a phrase that, that was defining a phrase that was never ever used. I mean, it was confusing because the definition was for a phrase that was never used. But that's sort of like saying that if the jury was instructed that the meaning of what constitutes a bank is X, well, it doesn't really matter because it's not an issue in the case, the judge never used the defined term. So I'm not sure why 41 creates any additional confusion. I think it became an issue because 41 talked about the intoxication having to overcome the specific criminal intent of willfully. And the Court of Criminal Appeals took issue with instruction 41 and it's discussed in the footnotes that that specific criminal intent language is not used elsewhere. And perhaps that specific criminal intent language should be back in the murder instruction that the specific criminal intent for first degree murder is malice of forethought. And if you look at the murder instruction, that's not in there. The element is just malice of forethought. It doesn't say anything about specific criminal intent. Well, to Judge Backhart's point, adding on to that, instruction number 2 says that the jury needs to consider all the instructions as a whole. So, I mean, whatever willfulness that they get out of instruction number 41, I guess it is, you're still in a situation where the jury's got 13 that defines malice of forethought, 12 that says that you have to have malice of forethought for this crime, and 12 is particularly significant it would seem to me because it's defining what the elements of the crime are. I mean, if the jury's going to do anything, aren't they going to look at that, you know, list of the elements and know what they need to find in order to find the defendant guilty? And just before I stop, and they would know based upon everything that went on in the trial and based upon the instructions that the only thing that really was the defense against them finding that was voluntary intoxication, right? And therein lies the problem, Your Honor. The jury wasn't adequately or accurately, and those are the words of the OCCA, instructed as to the defense of voluntary intoxication. Well, I don't think that's what we're debating here. I mean, I don't think that's what's at issue. So, the OCCA finds they weren't accurately instructed. The question is whether, well, depending on how one can choose what the law is, the question is whether that was harmless. And that leads us into this whole analysis of both what the defense lawyers did and what the prosecution did and what the instructions say, right? That's right. And Mr. Merlone's jury couldn't put that defense to work because they weren't instructed in the words of the OCCA that he should prevail on his voluntary intoxication defense if he could show that the intoxication overcame malice aforethought. It seems to me that your argument is, when I ask this narrowly, your argument is not, I'm sure, that, of what you just said, that the defendant has to prove the affirmative defense of voluntary intoxication. I know you've never argued that. Now, in Oklahoma, what I have understood your argument to be, that if the defendant essentially can negate the evidence of malice aforethought by showing that he or she was so drunk that he or she could not have formed the specific intent to deliberately take away the life of another person, that person could stand up and say, the state has not proven beyond a reasonable doubt the fourth element of Instruction 12, right? That's correct. Now, so, let's say there is no instruction on a voluntary intoxication. Now, in that case, would there be a deprivation of fundamental fairness? Would there be a constitutional violation? I'm not entirely sure I understand your question, Your Honor. What usually, the claim that usually comes before this court with respect to the voluntary intoxication defense is the petitioner argues, hey, I was entitled to that defense. I was entitled to the instruction in the state court, and I didn't get it. And they argued it in Thornburg, and my colleague, Presiding Judge Hart, wrote for a panel that said, even when there was no instruction on voluntary intoxication, there was no constitutional violation because the jury was already told, much like Instructions 12 and 13 in our case, that the jury could only convict of first-degree murder if it found that there was malice aforethought. And so, I have difficulty in seeing how if our court in a published opinion has already said that it's not a constitutional violation not to instruct at all on voluntary intoxication, why the confusion in the first line of Instruction 38 would somehow balloon into a constitutional violation. Well, here we're talking about an affirmative defense. Mr. Berlant had to come forward with a prima facie case of intoxication before he was entitled to that instruction. And once he receives that defense instruction, he has the protections of the Constitution. Well, he did get an instruction in 37 that he is defending on the basis of voluntary intoxication, right? And, Your Honor, I thought the question was, well, does he even get the instruction or does he have to have the instruction? Well, my only question is, well, how could it be a constitutional violation if we have already said that under the identical scenario, except the jury has not told anything about voluntary intoxication, that even in that extreme situation, there's not a constitutional violation. And here, you do have Instruction 37 that is a far more favorable situation for the defendant than was in the case in Thornburg, where the jury was told not only of what the elements were for including malice aforethought, but the jury was specifically told in 37 that the defendant was defending on the basis of voluntary intoxication. So how could that have blown into a constitutional violation if there wasn't one in Thornburg? Mr. Malone had a constitutional right to present his defense. And I'll point the court to Patton v. Mullin, where the voluntary intoxication defense was at issue. In there, the court said the right to present a defense is a fundamental element of due process of law. And there's other cases about affirmative defenses that this court has looked at. United States v. Loftin sets out that due process analysis. I thought the point you were trying to make earlier was even if he didn't have a right to have the instruction, once he had the instruction, he had a right to not have it screwed up. I mean, he had a right to have the defense, and therefore, he had a right for due process purposes not to have it mangled. That's right, Your Honor. Okay. That's right. My instruction was here. This goes back to the first thing I was asking you about a few minutes ago. It's not as if the jury was instructed voluntary intoxication isn't a defense. They weren't instructed incorrectly.  Let me put another. It's a matter of the language was poor, imprecise, so there wasn't adequate guidance to the jury, it seems to me. And if that's the case, if my understanding is correct in that regard, then the OCCA's determination that the way the trial was conducted, in particular, the arguments of counsel, the closing arguments, and that's clearly what the case is about is whether the voluntary intoxication prevented him from having the requisite intent. In that context, the OCCA found any error was harmless, and that does not seem to be an unreasonable assessment of the facts here. So I'm asking you first whether you agree with the premise. Do you think that the instructions affirmatively told the jurors something contrary to Oklahoma law, or is it, as I would have perceived it, simply a matter of the instructions not giving sufficient guidance because they used an undefined term that the jurors are unlikely to know? The instructions were objectively erroneous, and they were incorrect under Oklahoma law, and the OCCA, especially when after these instructions and criticized the whole series of voluntary intoxication instructions, the OCCA thought the error was so severe that they termed the error as plain error, and that's an incredibly high showing. It even entails a showing of a substantial rights violation. Well, I'm not sure about that. That term, I'm not sure it was being used in that precision, because then they went on to discuss harmless error, which doesn't make a lot of sense. I think they were just saying it's an error that we will recognize even though there was no objection below. Are you going to read me something that shows I'm misunderstanding the opinion here? There's an Oklahoma jury instruction case that came out after this, when Barnard versus State, 290P3759, and in that case, the Court of Criminal Appeals found no plain error because the instructional error was harmless. And, quote, if the error in this case is harmless under the Chapman-Edder test, it cannot by definition have affected the outcome of Barnard's trial, and cannot have affected Barnard's substantial rights under our plain error test. Here, there was plain error. Yeah, but then they went on to say it was harmless, which is a less strict standard than the substantial. I mean, it's harder to show. It's harder. Pardon? Though CCA can't have it both ways. Right. So, the only way to read that is to say they're using plain error, as we have on occasion. Sometimes we say something's plain error because it satisfies the first and second elements of a plain error analysis. Was there error and was it plain? And then the prejudice and effect on the reputation of the judicial system, the third and fourth prongs aren't included. I think that's the only reasonable way to read what they're saying in plain error. But let me get to the more important part. It's one thing to say that the instruction was erroneous. The OCCA certainly said it was erroneous. They don't want that instruction given anymore. The way it was given was bad, but not because, this is my question to you, not because it affirmatively misled the jury, but because it didn't give adequate guidance to the jury. That's the distinction I'd like you to address. In what way did that instruction tell the jury something that misled them, as opposed to didn't adequately guide them? And I'll paraphrase from the Court of Criminal Appeals decision. The instruction failed to inform Mr. Malone's jury that he should prevail on the voluntary intoxication defense if his intoxication was so great as to overcome mental support thought. Instead, they were given the technical legal term, mens rea, which means nothing to lay people. Right, but it could be supplemented by what the jurors, what the attorneys say at trial, which certainly seemed to be the case here. That's why, that's one of the two reasons the OCCA found the error was harmless. And I'd like to talk about the arguments of counsel. Okay. In this, all these claims are interconnected. There's an obvious synergy amongst them. But with respect to the ineffectiveness of defense counsel, they were caught sleeping when the instructions were read, or they didn't understand the contours of voluntary intoxication defense. And this becomes clear when you look at defense counsel's closing argument. And she merely parrots the defective instruction. And she argued, quote, meth intoxication can negate the ability alone to form the mens rea for murder in the first degree of the specific intent. But she also said that the very last thing she said, we would submit to you that Mr. Malone was so intoxicated on meth and Lord have they, did not, could not have physically formed the thought, whether that be a second before, an hour before, a day before, to kill trooper Nick Green. And she didn't just use, I don't know if both attorneys were female. I don't know why I thought that one had the term male. And if you correlate that with the definition of malice of forethought, it becomes clear that that's exactly what she's talking about, a deliberate intent to kill. The jury was never instructed that mens rea equals specific criminal intent or mens rea equals malice of forethought. What I'm saying is that the last passage, tell me why you disagree, if you do, the last passage that Judge Hartz read linked mens rea with essentially, do you have a deliberate intent to kill or not? And the definition and instruction, I could fish it out here, but in the instruction provided that 13, I think it is, said that malice of forethought means, do you have a deliberate intent to kill? And so why wouldn't it then, I mean, we're assuming a reasonable jury, not an incompetent one. Why would we assume that they could make that linkage? I mean, it's clear. Mens rea was never defined in the instructions. And that's not, well, whether mens rea was defined in the instructions. We have had cases like Boyd where we've looked at what counsel did in trying to understand how the jury would have understood instructions. It was either Boyd or a similar Supreme Court case in which we talked about the notion that jurors aren't lawyers and they're not sitting back there parsing the language. They're trying to understand what they're being asked to decide. These instructions provide them guidance. So everybody in this case is talking about whether Mr. Malone had a deliberate intent to kill. They had an instruction before them that defined malice of forethought as a deliberate, you need to have a deliberate intent to kill. Then why wouldn't the jury be able to understand that when, you know, and let's assume, you know, we're taking the premise that there was error here. But the point is, at the end of the day, as it relates to the text of the instruction, at the end of the day, why can't we be confident or at least have a reason to believe the OCCA was reasonable in saying that there was no harm done? Your Honor, it's a presumption of the law that jurors are presumed to follow their instructions. And this court quoted that language from Zafiro versus United States in the Turrentine case, which also dealt with voluntary intoxication and second degree murder. Here, the arguments of counsel can't take the place of jury instructions. One, I don't think one's positing that. If you go back to the point that Judge Hartz was making earlier, if you have, if your jury instructions say A, and then the counsel says not A, then it's clear that the jury is going to follow, they are presumed to follow A. But if the jury instructions say A, and then they leave a little gap as to what A is supposed to mean, and then counsel says, let me tell you what A means, then why is it the jury following the instructions in the fuller context of the proceeding and saying, I now have a sense fully of what A means? That's what we've got here. And you haven't responded to my point about, boy, I mean, it's clear the Supreme Court has done this. It said when you apply the instructions, you look at the proceeding as a whole. Isn't that right? The instructions as a whole. No, no, no, proceeding as a whole, including what evidence was introduced and what counsel argued. I, in Grant, in the recent Grant case, that liam analysis was used in a capital case to support the judgment. Okay. In the briefs, there's citation to Seventh Circuit case Bair versus Neal, and there's voluntary intoxication discussed in that case. And the jury was instructed in that case with respect to sentencing. They couldn't consider voluntary intoxication. That was wrong. And the courts below had said, well, that instruction may have been wrong, but it was very obvious from the evidence and from the arguments and from an expert witness that you could consider voluntary intoxication. And the Seventh Circuit said, oh, no, we can't do that here. The jury was given these parameters, and even though it was clear that that was an element in the case and that was evidence, that didn't overcome the defective instruction. With all due respect to the Seventh Circuit, I've just been talking about the Supreme Court and our circuit, and it seems to me at the end of the day, that's where I'm going to go.  I mean, the point is, explain to me why our law doesn't bind us. Then I'll care about the Seventh Circuit. Tell me. The instruction was objectively erroneous. I think if we look at Taylor, where methamphetamine intoxication was at issue and there was a voluntary intoxication defense in that case that linked up to the second-degree murder instruction, which we had here. We had a less-included instruction. I think Taylor is on par with this case. And Taylor compels the granting of relief here. It seems to me the way you described the Seventh Circuit opinion, it was one where the instruction was contrary to the counsel's argument. But let's turn to your third issue. We've... Please. In fact, I think we... You don't have to describe it, but let's hear what you have to say on that ineffective assistance claim. I was moving ahead to Kimmel and Albert, but we'll talk about counsel's failure to adequately prepare their expert witness. Here, Dr. David Smith was retained. This was an eminently qualified methamphetamine intoxication expert. He practiced medicine since 1964. He'd been qualified over 300 times at the time of his testimony in this case. He was a professor at the University of California, San Francisco Medical School. And he was a great methamphetamine expert. Here, counsel handicapped his efficacy. They didn't even arrange to have him interview Mr. Malone until the middle of trial. There's no question that he was deficient. I think counsel for the state has acknowledged that. The question is the second problem, Strickland. And so if Mr. Gutteridge had arranged for Dr. Smith to meet with Mr. Malone much earlier, say three weeks earlier, well, aren't we to reasonably infer that Malone would have lied to Dr. Smith just as he did the Sunday before trial and that Dr. Smith would be forced to acknowledge that if he ultimately testified? The statements that the client made to the expert witness are obviously not privileged. And so he ultimately would have given exactly the same testimony had he, had Mr. Gutteridge made the arrangements three weeks earlier, right? I don't think the testimony would have been necessarily the same. First, I'll just point out that both of these instances of ineffectiveness we've talked about. Respondent has conceded those were deficient performance. So we're arguing. Right. So why would the testimony then have been different? The testimony would have been different because Dr. Smith, like all expert witnesses, provided an expert witness disclosure. And he said, well, it's my understanding Mr. Malone was in a total blackout based on his methamphetamine abuse and his abuse of opioids. But I want to interview this guy because of this opioid blackout. I don't know what's going on. If he had interviewed Mr. Malone ahead of time, he would have been able to untangle this mess of what had happened. And this mess created by Mr. Malone's first attorney, who apparently told Mr. Malone don't reveal what happened to anyone including your investigators or your defense counsel. So if they had done that, then presumably the state would have cross-examined Dr. Smith precisely the way that it ultimately did at trial and said exactly and elicited exactly the same admissions that were ultimately elicited. And that is, so three weeks earlier, Dr. Smith, you met with Mr. Malone, correct? Yes. And what did he tell you? He told me that he had blacked out. And what did you say? I said, well, methamphetamine doesn't cause you to blackout. And he ultimately admitted that he was lying to both me and Mr. Gutteridge. Why would we infer anything different than that? The picture presented to the jury, this Oklahoma jury, was that the defense went to California and brought in this expert, this California expert, had them sit down with their client for an hour and a half. And now they were changing their defense theory in the middle of the case. Previously, defense counsel had laid the groundwork about this total blackout state that didn't turn out to be the case. So this failure to prepare not only impugned Dr. Smith, it impugned defense counsel for their previously laid strategy, and it impugned Mr. Malone. That wouldn't have been necessary if Dr. Smith came out earlier. The state court acknowledged the resulting mid-trial switch of defense theory made the state's task of discrediting Malone's expert witness. That much easier. And petitioner, and the district court acknowledged petitioner's case may have been stronger, more coherent, and less successful to impeachment. I think those are all synonyms for the reasonable probability of a different result. Are they really? Well, but what about the evidence at trial? Defendant talked to three or four people later that morning after the murder. Didn't say anything about hearing voices. He said he didn't remember stuff. And the video, my God. How do you reconcile his statements, his new story, with the video? I mean, that's the problem for you, is it not? This is a terrible case, and Mr. Malone's guilt of this homicide is not at issue. We don't press that. It's what degree of homicide was at issue. It was how his brain was functioning. That's correct. And there's some pretty good evidence of how his brain was functioning. He was severely impaired at that time, whether it's meth intoxication, opioid intoxication, mental illness. We know for a fact now that his brain is so impaired that he's forward incompetent, and respondent has conceded that point. I just have a few moments left. I'd like to talk about human of error. There's an inherent synergy in these claims, and that's what this court has looked at time and time again in either granting or denying relief for human of error. Here they all go to Mr. Malone's defense. And the court gets to review this human of error claim de novo, because the only error acknowledged by the state court in its human of error analysis was the instructional error. They failed to take into account the two conceded errors, the two conceded instances of deficient performance. Let me ask you a question about that. Was that argued to the OCCA in the briefs to the OCCA, the cumulative error argument? Was it based on these other deficiencies in performance also? I'm asking whether the full cumulative error issue was adequately presented to the OCCA. Yes, Your Honor, I believe it was. And defense counsel or appellate counsel asked the OCCA to consider every error raised in this cumulative error analysis, not just these three that we're talking about today, but every one of the errors alleged. Thank you. Oh, yes, definitely each of you. I have a couple of sort of big picture issues I want to get my hand a little round. One relates to the interplay between Davis versus Ayala and Frye versus Pyler. What I'm trying to understand, what is it your view of the impact of Davis on Frye and why isn't it the case that at the deference as it relates to the OCCA's Chapman determination is not still a relevant factor? And let me give what seems to be at least one plausible reading of the interplay between those two and you can tell me why it's wrong, which is that what the Supreme Court is saying is that you're still going to look and see whether the state court's reading of Chapman was unreasonable. And if it is unreasonable, then it necessarily follows that Brecht is not satisfied. And that in fact you cannot meet the Brecht test because it is not an unreasonable application of Chapman. And so I'll stop there and try to get your understanding of the interplay between those two cases. I think I'll start with Frye. That was the first case. And the issue there was, well, the federal court is supposed to apply Brecht and not Chapman in collateral appeals. And then the ADPA came about and the question was, well, do we still apply Brecht or do we do this reasonableness inquiry of the state court's Chapman determination? And Frye said, no, we still apply Brecht. Brecht is the more stringent standard. It's more stringent than Chapman plus 2254D. Davis came about and talked about the importance of the state court decision under 2254D, but it didn't upend Frye. Still at the end of the day, Davis holds that Brecht subsumes the 2254D inquiry such that if Brecht is satisfied, then the state court decision was necessarily unreasonable. And that's my reading of those cases. Okay. My next big picture question relates to the, we granted a COA as it related to this whole fundamental fairness issue as it relates to this instructional error. And what that leads me to ask is the question of whether the OCCA actually resolved a constitutional issue to begin with when it determined that the voluntary intoxication instructions were flawed. It seemed to me that the OCCA was speaking entirely to state law and saying that those instructions violated state law. And so first question, is there anything in that opinion that suggests that the OCCA either contemplated or believed that it was resolving a constitutional issue? Okay. I gather from looking at the briefing, the direct appeal briefing, that there was a constitutional issue presented to it. So it's not an exhaustion question. The question is whether the OCCA actually resolved it. And if it didn't resolve it, what standard of review are we going to apply to this issue that we have now granted a COA to relative to fundamental fairness? So those are the two questions. Okay. When we look at the OCCA opinion, it parses the jury instruction claim as a fair trial violation claim. Okay. So that's a constitutional violation. All right. Fine. Tell me where it does that. Because I saw no reference to any sort of constitutional issue. He was talking about what was valid under state law and what was not valid under state law. I think that's right at the front of the state court decision. The second indication that they found a constitutional violation, and it's in the footnotes, is the test that they apply. They drop a footnote and say, well, this is a fair trial violation. We're applying NEDR to this. And NEDR must be appropriate because NEDR was applied by the Supreme Court where an element of offense was left out. I'm looking at the case. Why does it necessarily follow that NEDR has any connection with whether a constitutional violation was presented initially? I mean, the question is, if wouldn't the court do exactly the same thing if there was an instructional error that was based entirely on Oklahoma law, they violated Oklahoma law, then the question is, what is the outcome of that violation? Is this violation harmless? What do we do with that? Why does it look any differently at all whether this was a constitutional issue or whether it was a state law issue? Because the state court, through NEDR, applied Chapman, the harmless beyond a reasonable doubt. And wouldn't it do that if it was a state law instructional violation? I don't believe so. What would it do? Chapman is the standard for constitutional violations, harmless beyond a reasonable doubt. Okay. And the Simpson case, not Kindred Simpson, but the Simpson case before that that Judge Lumpkin offered talked about what review is applied, whether it's a state law violation, that's what was at issue there, versus a constitutional violation, a federal violation. What case is that, I'm sorry? Simpson. Okay. And so what? And that's a plain error. Okay. Well, let's assume then that it is constitutional for the moment. Then I take it then that we're in the same realm of at the deference as it relates to its determination, right? You know, we're talking about the harmless error determination. We're talking about the harmless error determination. Can I interrupt just a question? I certainly don't want to stuff in your question. But my threshold question is, well, what about the issue of fundamental fairness? So in other words, if you're right that there was a constitute, that the OCCA held that there was a constitutional violation following up on Judge Holland's earlier question with regard to what is our standard in determining whether or not there was a deprivation of fundamental fairness, what would our standard be? And more to the point, would 2254 D1 have anything to do with it? Your adversary seems to suggest that it can say that it does. I don't see how 2254 D1 would have any bearing on it. Seems to me that it's a constitutional issue. D1 on its face doesn't apply. You're saying in your briefs that we have to defer. Well, you have said two things. One is that the OCCA held that there was a constitutional violation, and there you get into the dialogue that you've had with Judge Holmes. And because the OCCA held that, we somehow have to defer to the OCCA's determination of a constitutional violation, and I don't get that either. Wouldn't we have to say D1 has no bearing on this issue, and we, like any other constitutional issue, use our independent judgment, and we really don't care what the OCCA said on whether there was a constitutional violation. We have to independently determine whether there was a constitutional violation. Do you agree? I agree with that. I agree with that for two reasons. One, we're talking about harmless error analysis, so this court's going to fly bread. Well, I'm not. You know, I'm talking about fundamental fairness. Okay. With respect to the state court's finding of constitutional error, usually with 2254 D, we're talking about a state court finding of non-error, and that insulating the state court decision. Here, the state court found error. There is no insulation or no shelter to be provided by 2254 D. It's for this court to decide if there was a constitutional violation, and if there wasn't a constitutional violation, then maybe it's at least not. And we just use our independent judgment on that. We really don't care what the OCCA held, correct, on whether there was or not a constitutional violation in this context. Right. This court has to find an independent constitutional violation. Well, then, I'm sorry. Go ahead. As for fundamental fairness, I want to talk about that some. There is rift in the briefs as to what is the standard of review. Is it correct, harmless error, or is it this Estelle fundamental fairness? Okay. I'm sorry to do this to you, but before you get into a different issue, I stepped on his question. No, no, no. I think we're going where we need to go, but to your point, what I'm so confused by your reference to Brecht here. If I understood Judge Bachrach, and clearly what I'm focused on right now is error or not. And Brecht has nothing to do with the error or not question, does it? Brecht does not provide the error. Brecht is the tool for assessing the harm. It is, but we are talking now, in light of the grant of the new COA, which creates a number of sort of interesting issues here, but in light of the grant of the new COA, all we're talking about right now is, was there a constitutional violation of fundamental fairness? Now we don't have to worry about the clearly established law issue. Is there a constitutional law violation of fundamental fairness? Brecht, as you just acknowledged, relates to the harmlessness of a violation. We're not even talking about that. So the question is, if there's a violation, what standard do we use to discern whether there is a violation? Is it the Estelle standard that you kept referring to in the brief, before we knew there was clearly established law, or is it something else? And the Estelle standard would essentially be that reasonable likelihood standard that comes from Boyd. So is that what we would use? Okay, so presuming a constitutional violation, then what standard is applied? No, I'm not presuming a constitutional violation. I'm asking, the question is, we have to determine whether there's a constitutional violation. What test do we use to determine whether there is a constitutional violation? Mr. Malone's position is that the erroneous instructions deprive him of his fair trial rights and the right to present a defense. Once that violation is established, then the review would be pursuant Brecht. It would be a harmless error review. If we're looking at the Estelle line of cases, then to establish the violation would be a reasonable probability that the challenged instruction was applied in a way that violated the Constitution. Likelihood, reasonable likelihood. From Boyd. So is that, I guess, you know, because what we're talking about is, when we initially granted COAs, the only question was harmlessness. The OCCAA, according to your position, has discerned a constitutional violation here, our only question then was, did what the OCCAA do, whatever test you want to use, does it satisfy, give habeas relief on the harmlessness determination? Now, in light of the new grant of the COA, there's an antecedent issue, and that antecedent issue is, was there error at all to begin with? Not a question of whether it was harmless or not, was there error at all? And so on that issue, what I'm trying to get a sense of, in your reply brief, you started importing breadth again, and it seemed to me that was a conflation of the question of whether there was error with whether that error was harmless. Is what standard do you want us to use to discern, to the point that we don't have to defer to what the OCCAA did on the question of whether there was a constitutional violation or not, what standard should we apply to discern whether there was a constitutional violation based upon this jury instruction? There's discord in this court's prior opinions, and I think we need to look at Turrentine and Taylor. And in Turrentine, we have a stacking of this fundamental fairness Estelle inquiry with respect to the flawed instructions, and then the court applies breadth after applying Estelle. So both of them are stacked, and I believe that's a position that's respondents taking, that we have to make a showing under Estelle, and then subsequently have to make a showing under breadth. I believe that's incorrect. One showing of harm is enough to grant relief, and I think the question posited by the first COA grant, whether or not the error is harmless, I think that controls. Well, how could that be? I'm glad for that explanation, because that does tease out what we're talking about here. In one sense, there are two determinations that have to be made. One, is there error? Two, and as you state the state's position anyway, that's based upon Estelle, but Estelle appeared a lot in your brief. But let's assume that there's a question of is there error, and then the question is what standard, let's say is breadth. You apply to the harmlessness of that error. Well, if there is that first question, are you saying there is no, you know, you say the harmlessness COA controls, but how can that be? It was the only game in town, so it was the only thing we ever talked about until we granted the new COA. Now there are two independent COAs here. So we have to decide on the first part. Isn't that an antecedent question to whether there was harmless error, whether there was error at all? The court most certainly does have to answer that question, whether there was constitutional error. Okay, and on answering that question, do we defer to the OCCA's determination, as you say it, that there was constitutional error? I wish that was the case, but the way the EPA is set up is the 2254D just swings the door, and it's for this court to make the determination as to whether there's a constitutional error. Okay, so we have to make the determination whether there's a constitutional error. Next question, what standard do you want us to apply to make that determination? Here's a very elemental standard. It's whether or not Mr. Malone was deprived of his right to present his voluntary intoxication defense, this affirmative defense. And is that done under Boyd slash Estelle, or is it done under what? I mean, I haven't looked at this issue in this way before. I think that's done by looking at the error in the instruction, whether or not the jury was properly instructed as to the offense. Well, you have to use some legal tests to determine whether, in fact, that there was a constitutional violation there. In my mind, the Estelle Fundamental Fairness Inquiry, whether the instruction was so erroneous to render the trial fundamentally unfair, and the Brecht determination, those are both harm determinations. You have the erroneous instruction. We have an undebatedly erroneous instruction. Which one is it? Well, let me get your response to this. The Estelle slash Boyd uses the phrase, essentially, is it reasonably likely that the jury applied, it accepts that the instruction is erroneous, that it applied this instruction, erroneous instruction, in a way that deprived the defendant of fundamental rights. And so the question is not whether the instruction, the text of the instruction is not right. The question is whether it was reasonably likely that the jury that is not lawyers, sitting in the back room, parsing the, you know, the comma and the indefinite article or definite article, whether that jury is it reasonably likely, in light of all of the proceedings, that they would have deprived that defendant of his fundamental rights. That's the Boyd test. So we're not talking about is that the test you want us to apply before, and this is the important word, before we start talking about harmless error. It's Mr. Malone's position that both tests aren't necessary. You don't have to have both Estelle and Brecht. That Brecht is enough. Okay. He prevails under that standard. The respondent has argued in the briefs that this fundamental fairness inquiry, it's less rigorous than the substantial injurious effect test. So if we've shown harmful error, we've effectively satisfied Estelle. Well, I'm glad you clarified what Mr. Malone's position is. I'm glad I didn't misread the point in the reply brief that you made on this. But what I'm trying to struggle to understand is if, by definition, Brecht is a harmless error test, subsumed in that, implicit in that, is the notion that somebody somewhere found an error to exist. And so how can that test be the only one you apply? Because there's a question mark that will sit in my head as to, hmm, there's got to be an error there somewhere, doesn't there? And the error is Mr. Malone's fundamental right to have his defense presented, heard, and applied by his jury. And here that jury wasn't able to do so with these inadequate and inaccurate instructions. Does inadequate and inaccurate instructions, does that equal violation of his fundamental rights? In this case, Your Honor, I believe it does. Well, fundamental fairness analysis requires a strong showing of prejudice, right? In Estelle, it was an evidentiary instruction, as I recall. Wasn't it about the use of prior bad acts, something like that? With a child abuse prosecution, yes, Your Honor. And the reason we said in, what was the case, Spears, that you don't need to then look at harmless error if you found a fundamental fairness violation. And again, that was an issue, that case involved an evidentiary issue. It was the use of inflammatory photographs, not anything to deal with the elements of the offense or the defense. And what we said is you don't need to go into harmless error. We've already done that. We had to do that same analysis to find a violation of fundamental fairness. So it's not just the violation, it's not just the error that creates fundamental unfairness. It's the error plus the impact in the context of the case. Do you agree with that? I agree, and I think there's extreme prejudice here when we consider these errors in accumulation. And we can look at Littlejohn v. Royal, where there's discussion of the synergy of errors, making those errors more potent than the sum of their parts, and I think that's what happened here with counsel's failure with the expert witness, failures with the instructions, and the erroneous instructions themselves, all combining to the problem of his defense. Okay, we'll let you go. Thank you. Thank you, counsel, I appreciate your argument. May it please the court, I'm Jennifer Crabb, representing the respondent. I'd like to start by correcting a couple of things that I disagree with that petitioner's counsel said. When speaking of Instruction 41, he said that the – and what Instruction 41 is, it's the definitions that apply to the voluntary intoxication defense, and there are four of those, and two of them are incapable of forming special mental elements, and then another is incapable of forming specific criminal intent. And counsel said that it was the incapable of forming specific criminal intent definition that used the term willfully, but that's incorrect. It was the incapable of forming special mental element definition that used the term willfully, and the reason that that's significant is because, as Judge Backrock pointed out, the words special mental element are not used anywhere else in the jury's instructions, and so there was no way for the jury to apply that definition or the term willfully. The other thing that I wanted to correct is that counsel said that the court of criminal appeals found the existing Ouija instructions not just as used in this case, but the existing Ouija instructions to be deficient, and they specifically said, in paragraph 34 of their opinion, that the instructions were not legally inaccurate, inadequate, or unconstitutional. This case boils down to all three of the alleged – of the admitted, in some cases, errors, boil down to petitioner's intent to kill or lack thereof. Are you saying the Oklahoma – going back to your paragraph 34 point, are you saying that the Oklahoma court of criminal appeals, therefore, did not find there to be a constitutional violation here? No, Your Honor. I'm saying as to the broader point of whether the Ouija instructions, had they been used properly – Oh, whether they had a problem. Correct. Got it. You actually conceded in your red brief, did you not, that you said that the OCCA did find a constitutional violation? I believe they did because of the application of Chapman. I agree with counsel about the Simpson v. State case, yes. But let me ask you a question, because you also, maybe before you get into the content of your individual arguments with regard to the applicability of the AEDPA, you have an argument in your red brief with regard to the existence of a clearly established constitutional right. I assume that you make that argument because you're assuming that 2254 D-1 applies. I don't see how 2254 D-1 could possibly apply if you're correct that the OCCA held that there was a constitutional violation. And to explain that question, as I understand, essentially, the operation of 2254 D-1, it says that when the state's highest court adjudicates on the merits a constitutional claim, the petitioner cannot be granted habeas relief unless he or she shows that the decision by the state court was contrary to an unreasonable application of clearly established federal law. Well, if that applies when the state court finds a constitutional violation, it would be an absurdity because that means that Mr. Malone could only show that he was entitled to habeas relief in light of the finding of a constitutional violation unless we conclude that the Court of Criminal Procedure was unreasonable in finding a constitutional violation. And only if we say that there was no constitutional violation and it was unreasonable, only then can we grant habeas relief to the petitioner. And that wouldn't make sense. So I don't understand how 2254 D-1 or the necessity of a clearly established right could apply if the state court acknowledged a constitutional violation. Because this court has described that, the clearly established part of D-1, as a threshold question. And I understand what you're saying. Certainly, he would not have to show that the state court erred in finding constitutional error. But it's a threshold question. And also looking at the broader context of AEDPA and its purpose, which is to affirm reasonable state court judgments, it doesn't make sense to allow a habeas petitioner to obtain federal habeas relief for a supposed constitutional violation, the right to which is not clearly established, simply because the state court gave more protection by finding a constitutional error. And yet, had the state court in that same case found no constitutional error, this court wouldn't even review it. Because of the threshold matter, there's no clearly established law. Well, you said that there's cases that have established that. All of the cases that I'm familiar with. And, for example, you relied on Judge Holmes' opinion in House v. Hedge. Those are cases when the state's highest court held that there was not a constitutional violation, in which it makes perfect sense. That is consistent with Congress's intent in 1996. But how can it make... I mean, first of all, are there any cases that have said that you apply 2254-D1 or the necessity of a clearly established right when the state court acknowledges a constitutional violation? Not that I'm aware of, Your Honor. Let me ask a question. This seems to be the same issue we came up with when we were talking about plain error. Because we talked about plain error in two ways. One, that there was an error and it was plain. And we also used the term when we were talking about the four-pronged test for plain error, which includes prejudice. We can say that what happened was contrary to the Constitution. But unless the defendant was prejudiced, and the standard would be, whether we can say this beyond a reasonable doubt, that he wasn't prejudiced. Unless he was prejudiced, he's not a victim of constitutional error. Under 2254-D1, one of the components of the state court's decision could be that, yes, there was constitutional error, but it was harmless. And the Supreme Court has said, I believe, that under 2254-D1, we defer to the state court on whether the error was harmless. Was it an unreasonable determination of that? If I'm correct about the Supreme Court's doctrine in that regard, then there is case law to the effect that we're talking about. That sometimes the state court is challenged because it found no constitutional error. Sometimes it's challenged because even though it found a constitutional error, said there was a constitutional error, said it was harmless. Sometimes the state court doesn't decide whether there was a constitutional error and says, we don't need to determine that because it didn't affect the proceedings anyway. Am I? Yeah, maybe we need to have more. Let me just follow up on that point. With those scenarios, isn't this a scenario in which the OCCA finds constitutional error, and then it applies Chapman constitutional test? Could it not be the case that the question of constitutional error, whether or not, is applied outside of the rubric of D1 or AEDPA generally, and the question of whether that error, I mean, is it possible that whether that error was harmful or harmless would be applied, that question would be resolved under AEDPA? The reason for that being that in the first instance, to Judge Bacharach's point, it just seems there's an incongruity between applying AEDPA to the first question of their resolution that there was a constitutional violation, but as it relates to the second question, they denied the petitioner relief under a constitutional test. This case is a little strange one, we know, because ordinarily OCCA is not granting relief. In this situation, you have them granting relief, but holding that it's harmless. The only way they get habeas relief is if we look at that question, so it sort of triggers our normal route of doing AEDPA. Is it possible that we could have this sort of split screen in which we first say, under not giving AEDPA deference to anything, just say, were they right about a constitutional violation? And if they were right, then we have to do AEDPA deference as it relates to the second issue. Yes, and I think that's exactly what this court will do, is review. Everything we've said. I agree, you will review de novo, you will make a de novo determination of whether there's a constitutional error, and then you will apply 2254 D1 or 2 to the harmless error. And my argument regarding clearly established law is something of a moot point, or is a moot point, I guess, after Grissom, but I will explain, since you've asked, that my position is that although the state court did find a constitutional error, and I tried to explain this before, but maybe I didn't do so adequately, so let me try again. As the court recognized in House v. Hatch, the state court, a state court might find a constitutional violation in the absence of Supreme Court precedent requiring it to do so. They can give a more broad interpretation of the Constitution than the Supreme Court has, than this court might. And so, but federal hideous relief, in my view, should only be available for those constitutional errors which have been clearly established to be constitutional errors by the Supreme Court. So, this court should ask, is a threshold matter, regardless of whether the state court has or has not found a constitutional violation, is there a clearly established law upon which the petitioner can rely in this case to show a constitutional violation? In this case, what difference does that make, given the claim of ineffective assistance? There's no question that that was a constitutional error recognized by the Supreme Court, by the U.S. Supreme Court, that failure to object to this instruction was ineffective assistance, was deficient performance under the Constitution. So, even if this was an instruction just required by state law, not by the U.S. Constitution, we'd be going through the same process, would we not? Yes, I agree. I agree. This boils down to whether petitioner had the intent to kill Trooper Green. But we wouldn't be doing that as it relates to your fundamental fairness argument. I mean, and when I'm thinking about how this opinion would shape up, I mean, it is a distinction with a difference. I mean, what you're saying is that we, you know, granted the point is mooted by Grissom, but you were saying we actually would look to see as it relates to that fundamental fairness thing that we granted a COA on. We would look to see whether that was clearly established law. A, if I'm understanding you correctly, but the flip side of the petition, that at least I thought I heard Judge Bachrach espousing, and I'm espousing to some extent, at least in terms of a question, would be the other side would be, no, we wouldn't do that at all. Grissom would be irrelevant. I mean, when we write this up, our only question would be under the law as it exists, was there a constitutional violation? Right? So there is a distinction with a difference. I agree. Now I'm confused. Aren't all these issues mooted by our determination of whether there was harmless error? And don't we defer to the OCCA regardless of which of these constitutional claims is made? That we still ask, was it unreasonable for the OCCA to find that the problem with the instruction was harmless? Whether the problem with the instruction is a constitutional issue on its own, whether it arises because of ineffective assistance of counsel, or whether it arises because of some concern about fundamental fairness. Is there a difference in the ultimate way we would decide this case, which is, was the error of whatever sort harmless, and to what extent we defer to the OCCA in making that determination? If Petitioner had not alleged ineffective assistance of counsel or did not have a COA on that, then it would matter greatly because Petitioner would have to show a constitutional violation before the court would move to harmless error, and Greer v. Miller says that. But do we end up eliminating any issue by how we decide this? In other words, aren't we still going to be in a situation where we say, was the OCCA, well, what I could conceive of, and this is what I want to try to understand for purposes of what this would look like. Are we saying, one, is there a constitutional violation of the instruction itself? Did the instruction violate fundamental fairness? One. Whether you buy it or not? One. Two, even irrespective of what the answer to that question is, we have a question of whether the OCCA violated Chapman and unreasonably applied Chapman. And so that, theoretically, we'd have to reach that question, too. Three would be, you know, and then it would play out. Then we'd do the ineffective assistance, which would be influenced, of course, by the answer to two. And then we would do the ineffective assistance as it relates to the Dr. Smith and the rest. I guess what I'm saying is, at the end of the day, do we still deal with all the questions, or if we were to find, this is a real pregnant thing for me, if we were to find that there was no constitutional violation at the first stage, do we ever do Chapman as it relates to the instructional error? No, you do not. Okay. In Greer v. Miller, what the Supreme Court did, it was a Doyle error. The state court had found a Doyle violation. The Supreme Court said, we have to decide for ourselves whether there was a Doyle violation. They said they didn't. Now, they did go on with further review, but that was because they wanted to determine whether the prosecutor committed misconduct by, it appears, attempting to commit a Doyle violation. But, no, if this court finds no fundamental fairness violation for Proposition 1, that's the end of the issue. But we would still do the, we'd still do strict one, right? Yes. All right, got it. Yes. All right. And the reason that the answer to the fundamental fairness question, and the prejudice question, and the Brecht question are all no, is because there can be no doubt as to Petitioner's intent that night. He took a gun with him, and he asked for the gun specifically in case he got in trouble with police. After he subdued Trooper Green, Petitioner asked, where are the keys to these cuffs? And when Trooper Green said he did not know, Petitioner said, then you'll die. And during Petitioner's testimony at the trial on page 977 of Volume 4 of the transcript, the prosecutor said, if he doesn't give you the handcuff keys, you're going to kill him. Is that what that dialogue indicates to you today? And Petitioner responded, yeah. And then we have the fact that after telling Trooper Green that he is going to die, Petitioner shoots him twice in the back of the head. At least one of those is a contact wound. And as I pointed out in my 28-J in Grissom, very similar facts. The victim was shot twice at close range in the head, and this court said that clearly established Grissom's intent to kill, and it does so here as well. How does that relate to hearing voices? What if, couldn't all of what you said be consistent with his hearing voices telling him to do these things? In a theoretical world, it could be, but that would be an insanity defense and not a voluntary intoxication defense. That would be that, yes, he intended to kill this person, but it was because he thought he was being robbed by a drug dealer and the voices were telling him that if he didn't kill him, then the trooper, he says he didn't know he was a trooper, but then the victim would attack him. That would be an insanity defense. That is not established. Even if it's insanity generated temporarily by intoxication? Is there such a thing as a temporary insanity defense in Oklahoma? It would be, I don't... I would think that temporary insanity would be the same as, if it's caused by drugs, that that would be the voluntary intoxication defense, essentially. I disagree. I think they're distinct. I'm sorry, Judge. No, go ahead. I'm sure your answer will be better than mine. Go ahead. The instruction number 34, which was regarding the insanity defense, says the person is insane when that person is suffering from such a disability of reason or disease of the mind that he does not know that his acts or omissions are wrong. The jury was instructed on this. They were instructed on this, correct, and is unable to distinguish right from wrong with respect to his acts or omissions. A person is also insane when that person is suffering from such a disability of reason or disease of the mind that he does not understand the nature and consequences of his acts. Now, I don't disagree that meth intoxication could cause someone to fit within this insanity defense, but I do think that voluntary intoxication is distinct. Voluntary intoxication is a state in which someone is incapable of forming the intent to kill, whereas insanity occurs when someone may be able to form the intent to kill, but their reason for it is not grounded in reality. The voice has told me to do it. And that hints the two shots in the head to him. I guess the hypothetical that I thought about when we were having this, when I was thinking about this, is if you have the insanity defense, if you had a bug, he thought it was a bug, and so he shot the bug twice. The question of whether there's wrongfulness associated with that, I think his ability to say, I didn't know it was wrongful, I thought it was a bug, it's not against the law to kill a bug, blah, blah. But if he has voluntary intoxication, he knows that's a human being. His judgment as to why he should kill him may be obscured in the sense of he's not thinking realistically as to why he should kill him, but he knows it's a human being, and he puts two shots in the back of his head. Is that correct? Or I think the insanity defense that he was somewhat angling towards at trial was that I thought this was someone trying to rob me, therefore this was self-defense due to my insanity. What I'm hearing from this is the expert's testimony about his hearing voices and all was totally irrelevant to the voluntary intoxication defense. It might have been relevant to an insanity defense, but the fact that he's hearing voices has nothing to do with whether he intended to kill. I ask, how would this fit in, all this conduct that shows intent, and you're telling me it doesn't fit in with intent, it might be relevant to insanity. That makes the third issue problematic. It's founded on a faulty premise that if they could have put on this testimony without complication, that that would have helped him with the voluntary intoxication defense, but it's actually on a different axis from that. Am I understanding you correctly? You are, Your Honor, and in fact, on direct appeal, the theory of harm for the failure to adequately prepare Dr. Smith was that it caused us to pursue an insanity defense too late. And when you read the Court of Criminal Appeals opinion, it's very clear that that's what they're analyzing. This is insanity defense with regard to Proposition 3. Not related to voluntary intoxication. Yes, but his theory was it made me change my theory of defense mid-trial and I was too late to adequately pursue my insanity defense. Now, I would disagree with that as well, but Dr. Smith did testify, it was the last question asked to him on direct examination, that he did not believe that Petitioner was capable of forming this specific intent, but he never really explained why methamphetamine would have caused him to be unable to do so. Other than these voices, which, as I explained, really that defense was, I was being attacked by someone. He'd been at the anhydrous tank and he said that he saw shadows moving, he thought there were people everywhere. And so then he's awakened by someone who has a gun to his head and he thinks he's being robbed, and the voices are telling him he's trying to get up, he's trying to get up, shoot him. So that, as I said, is an insanity defense and not a claim that I was so intoxicated that I just didn't really understand what I was doing. I couldn't form the intent to kill. And, of course, as I point out, we know he formed the intent to kill. He admits, essentially, that he formed the intent to kill. That leads me to ask a question on the cumulative error argument in preservation. Did the defendant present the argument to the OCCA that there was a cumulative error of the question about the faulty instruction, the ineffective assistance of counsel in not objecting to the instruction, and the ineffective assistance of counsel in preparing the expert which harmed the voluntary intoxication defense? If the cumulative error argument was with respect to the same conduct that I've described, but the prejudice from the failure to prepare the psychiatrist or the expert was only with respect to the insanity defense and not with respect to the voluntary intoxication defense, then it seems to me the cumulative error argument being made here was not preserved in state court. Can you elucidate that? Sure. I have not recently reread the brief, the direct appeal brief regarding the cumulative error claim. They are typically a page and a half which simply refer back to the propositions as they were raised. So assuming that that's what it was, then yes, I agree that because he's making a different prejudice argument now than he did then, that that would not be. Let me follow up, if I might, on Judge Hartz's question. In Cargill, of course, we have precedent saying that for stand-alone claims like a Brady claim or an ineffective assistance claim that have a built-in ingredient of materiality, that those will be aggregated for purposes of cumulative error with other constitutional violations, that they will be accumulated. Oklahoma law is different, isn't it? In the Oklahoma Court of Criminal Appeals, they don't have a precedent like Cargill, do they? In my recollection of Oklahoma law in the OCCA, is that the Court of Criminal Appeals will only aggregate claims that aren't themselves sufficient to create a constitutional violation. So if there is, for example, an ineffective assistance claim that falters on the first prong, we would aggregate that under Cargill, but the OCCA would not. Am I correct? I cannot recall reading a Court of Criminal Appeals case that spells that out one way or the other. In this case, they said they found only one error. So we know that they did not consider the deficient performance by counsel. Now, I would argue that there is no clearly established law that requires them to do so. I acknowledge Cargill says that this Court does so, but because the Supreme Court clearly... Well, we have Hanson as well. Yes, yes. But for purposes of a DPA review of the Court of Criminal Appeals harmless error, there is no clearly established Supreme Court precedent requiring the Court of Criminal Appeals to combine deficient performance by counsel, which does not... Oh, sure. Yeah, I'm not suggesting otherwise. I don't know that anybody would. My only question is, you know, we do have precedents. I think Cargill is one. I think Grissom is another, if I'm not mistaken, that say that when we find constitutional violations, in addition to those constitutional violations that are found by the state's highest court that will apply to double review, and you don't disagree with that? I don't disagree with that, but I do disagree that deficient performance by counsel in and of itself is a constitutional violation. The Supreme Court said in Strickland that it was not. Right. Yes. In any event, was there any difference in the prejudice from giving the improper instruction and the prejudice resulting from ineffective assistance and not objecting to the instruction? There is not, Your Honor. So the court, even if it didn't include prejudice from ineffective assistance, it weighed the same factors exactly as it would have if it did include that. Is that correct? Yes. Except for the Dr. Smith issue. Correct. Except for the Dr. Smith issue, yes. Right. Can I ask you about that? I don't mean to interrupt your train of thought, but I will, I guess. But on the Dr. Smith issue with regard to prejudice, let me ask it this way. In private practice, I, like every other lawyer I have ever known, hire experts and we trust that they will use their independent judgment and we hire them as consultant experts and they're still within the privilege and we give them the facts and they tell us what they think. And if we don't like what they think, we don't designate them as an expert, we go to the next potential expert. Now, wouldn't any lawyer worth their salt, I'm not suggesting Don Gutteridge is not worth his salt, but wouldn't it be highly prejudicial to go ahead, wait until the Sunday before opening statements and say, okay, we're going to use you. Why isn't it so prejudicial? Because if he had done what every other lawyer I know does, and that is hire somebody as a consultant before you designate them, and if he ends up saying what he did, which is, Mr. Bellows is a big fat liar, then it's still privilege. You don't disclose him. There's no obligation in state law to disclose him. And then you learn the truth and so you don't falter an opening statement and say, you know, he blacked out because now you know that that's not true and you have another expert, potentially, that will give favorable testimony and worst case scenario, you don't have the time bomb that erupted when Dr. Smith testified because that was, I mean, how in the world is he going to get an acquittal when his star expert witness says, yeah, I found out two nights ago that he's been lying, not only to me, but to his lawyers. But he's telling the truth to you, jury. I mean, that's so prejudicial. I see that I'm out of time, if I may respond. Well, actually, you're not out of time because we went about 20 minutes over and we usually get closing counts of that, but you have plenty of time if you want to. Yes. I have two responses to that, Judge Bacharach. The first is that until his reply brief petitioner has never suggested that another expert might be hired, we don't know who that expert might be, what they might say, any of that. And then the other one is that the prejudice from this, the revelation of the lie at trial, is not nearly as damaging as petitioner makes it sound. For one thing, we know that petitioner lied to police and told them that he couldn't remember as well, so the jury would have known that he lied about his recollection. For another, an opening statement counsel didn't say that Malone had a blackout. She said that using methamphetamine affects your memory. And then she asked each of the four witnesses, petitioner's sister and his three friends, does methamphetamine affect your memory, and they all agreed that it does. And then Dr. Smith testified, no, you're not going to have a blackout, but both defense counsel and the prosecutor accepted and interpreted Dr. Smith's testimony as saying, while you won't have a blackout, that doesn't mean that you're going to have perfect recall. And when you read petitioner's testimony, there's a lot that he still did not remember. Although he no longer claimed a blackout, I don't remember anything that happened that morning, there were a lot of things that he still said, I don't remember, I don't remember, I don't remember. And so defense counsel was able to still use what she'd said in the opening statement and the testimony she'd elicited from the four witnesses to try to explain petitioner's seemingly convenient gaps in memory, that he was using methamphetamine, though he didn't have a blackout, but it still affected his memory. On that point, I believe petitioner's counsel said something about the jury knowing that the defense theory has changed and there's nothing in the record to suggest that the jury knew that. As I laid out, the only thing really that the jury knew was the memory issue and that was not as prejudicial as Malone was supposed to remember everything. It still was accepted that Malone might have gaps in memory. As I said earlier, this case boils down to, while there are a lot of other ways that this court could affirm, ultimately any error in this case was either not prejudicial or was harmless based on petitioner's intent to kill. He admitted in his trial testimony that his statements indicated an intent to kill and then he told J.C. Rosser afterwards that he fired the second shot in order to make sure that Trooper Green was dead. There's no doubt as to petitioner's intent to kill in this case. Just a couple of questions. Going back to your point about, at least they posited that there was self-defense based upon his voluntary intoxication. You can have an intent to kill, but if you have an intent to kill based upon your theory that you're about to be killed, wouldn't that still make their voluntary intoxication defense viable? Let me just clarify that self-defense was my word. That word was not used at trial because his testimony was that he thought he was being robbed and the voices told him to kill. If he had truly thought it was a self-defense, I agree. You could have the intent to kill, but still act in self-defense. That's a big difference because if he's not talking self-defense, if you kill a robber that's on the ground and put two bullets in the back of his head, you still had intent to kill and I think you'd have a problem with the law, which is different than the self-defense scenario, right? Yes, correct. Okay. Before you sit down, I just want to get your take on the interworking between Fry and Davis. Because, I mean, actually there have been at least a few circuit courts that have talked about this post-Davis and how that test should look now in light of Davis. What's your view on that? I think this court has two options. You can begin with whether the Court of Criminal Appeals reasonably applied Chapman and if you find that it did, then that would end your inquiry. But if you found that the court did not reasonably apply Chapman, you would have to then go on and apply Brecht or you could simply go directly to Brecht and if you found no substantial and injurious effect, then you would have necessarily found that the Court of Criminal Appeals reasonably applied Chapman. And it is not clear to me from those opinions that this court has to do it one way or the other. I thought Ayala said that it was sort of built in to the Brecht test, that it's not a two-part inquiry. In other words, you don't apply 2254 D.1 and say, was the state court's adjudication on harmlessness unreasonable that you just apply the substantial and injurious influence on the verdict test and that the reasonableness of the state court's determination was taped into the Brecht test? My mind says you don't have to do both. I don't recall it saying that you may not do both. I think that the reason that the court granted cert in Ayala was that the, the Ninth Circuit said we don't, basically we don't care about the state court's decision because of Brecht and I think the Supreme Court was just clarifying that you still owe a lot of deference here. If the court does not have any other questions, I would ask you to affirm the district court's judgment. Thank you, counsel. We don't, at least I don't, enforce the same rules in capital cases and you've certainly used more than your time, but if you would like to reply for two minutes, you may. Judge Bachrach had asked a question about Dr. Smith. He has characterized Dr. Smith not meeting with Mr. Malone until just before Vort Aeger. It was worse than that. It was the middle of trial. Oh, that's right. It was before the defense presented its case in chief. As for issues of intent, this is a case of intent. Mr. Malone fully agrees about that. Whether this was first degree murder or secondary murder, that's what the issue is. Dr. Smith testified quite a bit, although unconvincingly, when they only met with Mr. Malone for an hour and a half, about methamphetamine intoxication and how these delusions play into that. And Mr. Malone testified himself in his defense and talked about hearing the voices and not shooting to kill, but to keep the trooper off of him. And Dr. Smith reinforces that testimony with these two shots. And there's these seconds, there's a sizable gap between the two that seems to fit with this methamphetamine intoxication and this concept that there's what seemed to Mr. Malone's external stimulus, but internal stimulus of something going on in his brain that necessitated that second shot. Go ahead. Did we say the same words? I think we did. How does that connect with the intoxication defense? That is intoxication. Well, it's intoxication creating insanity as opposed to intoxication creating inability to intend the act. Having someone tell you to do it doesn't diminish the fact that you intend to kill somebody. It's just you're doing it because of a voice telling you to. And we're moving into a real esoteric conversation, and maybe even touching on this willfully language in the jury instructions versus the specific criminal intent. But Mr. Malone's testimony is I intended to keep him off of me as opposed to I intended to deliberately kill the trooper. There's a big difference there, and that difference is recognized in the law, and it's recognized in Oklahoma with the difference between first-degree murder and second-degree murder. Well, there was a colloquy that Judge Hart had with your opponent that goes to a question of whether there's actually preservation here. I mean, if the theory that you pursued before the OCCA was that the harm was related to the inability to pursue an insanity defense, and the theory now is that the harm relates to the inability to pursue an intent to kill under voluntary intoxication, there's a preservation problem. At least that's what I understood the colloquy to be, and correct me if you understood it differently and if you think that there is a preservation issue here. I don't think there's a preservation issue here, Your Honor. I think the harm on direct appeal encompassed both aspects, the voluntary intoxication defense and this NGRI defense. The NGRI defense got added in the middle of trial, it's my understanding, because Dr. Smith kept referencing methamphetamine intoxication mimicking the paranoid schizophrenia model. If counsel had spent more time with that expert, perhaps they would have had a more coherent presentation and thought more about what they were putting in front of the jury. Mr. Malone requests that the court reverse with instructions to grant the writ. Thank you. Thank you very much, counsel. Case is submitted. Counsel are excused. We'll recess until 9 tomorrow morning.